Entered: April 30th, 2021
Signed: April 30th, 2021

MARIA ELLENA CHAVEZ-RUARK
U.S. BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Greenbelt**

| | |
|---|---|
| In re:<br><br>GREGORY B. MYERS,<br><br>Debtor. | Case Number: 15-26033-MCR<br>(Chapter 7) |

MEMORANDUM TO PARTIES IN INTEREST REGARDING
ENTIRETIES AND EXEMPTION ISSUES PREVIOUSLY LITIGATED

The Court issues this Memorandum to all parties in interest in this bankruptcy proceeding pursuant to Section 105(a) of the Bankruptcy Code, which provides in pertinent part:

> No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

To be clear, this is a communication from the Court to parties in interest reciting issues that were previously decided by this Court. This is not an order.

Gregory B. Myers, debtor herein (the "Debtor"), filed (i) a Motion for Entry of Order Instructing Roger Schlossberg to Turnover Fully Exempt Property [Dkt. No. 881] on July 24, 2020; (ii) a Motion for Disgorgement [Dkt. No. 887] on September 14, 2020; (iii) a Motion for Disgorgement [Dkt. No. 888] on September 14, 2020; and (iv) a Motion to Compel [Dkt. No. 908] on March 16, 2021 (collectively, the "Debtor's Motions"). The Debtor withdrew one of the motions at a hearing held on April 6, 2021, and he withdrew the other three after oral argument on the motions but only one day before the Court's scheduled oral ruling on the motions. In addition, the Debtor served interrogatories and document requests (the "Debtor's Discovery") on

Roger Schlossberg, the Chapter 7 trustee (the "Trustee"), on January 28, 2021 (which prompted the Trustee to file a Motion for Protective Order [Dkt. No. 906]). Furthermore, Barbara Ann Kelly, the Debtor's wife, filed a lawsuit in the Circuit Court for Montgomery County styled *Kelly v. McNamee Hosea Jernigan Kim Greenan & Lynch, P.A.*, which the defendant then removed to this Court (Adv. No. 20-00284-MCR) on September 2, 2020 (the "Kelly Litigation").

Many of the issues raised in the Debtor's Motions, the Debtor's Discovery and the Kelly Litigation were litigated and decided by this Court long before the motions and litigation were filed and the discovery was served. These issues include:

- That Lot 6 and its sale proceeds, both of which are owned by Debtor and Ms. Kelly as tenants by the entireties, are property of the Debtor's bankruptcy estate;
- That this Court has jurisdiction over the Lot 6 sale proceeds;
- That applicable law requires that the Lot 6 sale proceeds be used to pay tax claims and joint claims of the Debtor and Ms. Kelly; and
- That those tax claims and joint claims must be paid before the Debtor's claimed tenants by the entireties exemption takes effect (collectively, the "Entireties Issues").

Through the Debtor's Motions, the Debtor's Discovery and the Kelly Litigation, the Debtor and Ms. Kelly sought to challenge the Court's rulings and the parties' positions over the six-year course of this bankruptcy proceeding regarding the Entireties Issues.

The law is well-settled on each of the Entireties Issues. *See, e.g., Alvarez v. HSBC Bank USA (In re Alvarez)*, 733 F.3d 136, 141 (4th Cir. 2013) (concluding "a debtor's undivided interest in entireties property is part of that debtor's bankruptcy estate"); 28 U.S.C. § 1334(e)(1) (stating the "court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction … of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate"); *Sumy v. Schlossberg*, 777 F.2d 921 (4th Cir. 1985) (holding that property owned as tenants by the entireties in individual debtor's bankruptcy estate may not be exempted and may be administered by trustee to extent debtor and non-filing spouse are indebted jointly); *In re McRae*, 308 B.R. 572 (N.D. Fla. 2003) (stating "if both spouses are jointly obligated on the debt, then the joint creditor may reach the entireties property" and "[w]here joint creditors exist, a debtor's equity in entireties property above the amount of the joint obligations qualifies for the Section 522(b)(2)(B) exemption"); *United States v. Craft*, 535 U.S. 274 (2002) (holding federal tax lien can attach to property owned as tenants by the entireties even when only one spouse is liable on tax debt).

It is also well-settled that joint creditors need not possess a joint judgment against a debtor and the non-filing spouse or a lien against the entireties property to be able to recover on their claims from entireties property. *See, e.g., Sumy v. Schlossberg*, 777 F.2d at 928 n.14 ("the absence of a judgment or lien has no bearing on the hypothetical issue of whether the debtor's interest would be exempt from process under state law, so the property cannot be exempted and remains part of the estate to the extent of joint claims regardless of the joint creditors' actual possession of a judgment or lien under state law"); *In re Monzon*, 214 B.R. 38, 42-43 (Bankr. S.D. Fla. 1997) (adopting rationale in *Sumy v. Schlossberg* and concluding that "a joint creditor need not hold an actual judgment as a prerequisite to administration by a trustee" and that "joint

debt, even though not reduced to judgment prepetition, precludes the Debtor from claiming the entire [tenants by the entireties property] as exempt").

To be clear, the Debtor's undivided 100% interest in the Lot 6 sale proceeds and any other entireties property is property of his bankruptcy estate, this Court has jurisdiction over all property of the Debtor's estate, the Debtor's entireties property may be administered by the Trustee for the benefit of tax claims and joint claims (regardless of whether the claimholders have a judgment or lien), the Debtor's entireties property may not be exempted to the extent of any tax claims and joint claims and the Debtor's exemption applies only to entireties property that remains after the payment of all secured, tax and joint unsecured claims.

The Entireties Issues were litigated, decided, discussed and/or implicated numerous times over the course of the bankruptcy proceeding, including but not limited to:

1. On September 28, 2016, when the Debtor filed his motion seeking authority to sell Lot 6 [Dkt. No. 124]; on October 19, 2016, when the Court held a hearing on the Debtor's motion to sell Lot 6 [see Dkt. No. 173]; and on October 25, 2016, when the Court entered an order granting the Debtor's motion to sell Lot 6 [Dkt. No. 175];

2. On December 2, 2016, when Serv Trust filed a motion seeking entry of an order authorizing the Debtor to release the Lot 6 net sale proceeds to it after accounting for all disputed claims and paying all joint claims of the Debtor and Ms. Kelly [Dkt. No. 222] (which Serv Trust withdrew on February 1, 2017 [see Dkt. No. 289]);

3. On January 20, 2017, when Ms. Kelly filed a motion seeking entry of an order authorizing the Debtor to release the Lot 6 net sale proceeds to her after accounting for all disputed claims and paying all joint claims of the Debtor and Ms. Kelly [Dkt. No. 269]; on February 1, 2017 and February 15, 2017, when the Court held a hearing on the motion [see Dkt. Nos. 292, 313, 515 and 516]; and on February 23, 2017, when the Court entered an order granting the motion [Dkt. No. 321];

4. On March 7, 2017, when the Trustee filed a motion to stay the order authorizing the release of the Lot 6 net sale proceeds to Ms. Kelly after accounting for all disputed claims and paying all joint claims of the Debtor and Ms. Kelly [Dkt. No. 330]; on March 9, 2017, when the Debtor and Ms. Kelly filed responses to the motion [Dkt. Nos. 339 and 340]; on March 9, 2017, when the Court held a hearing on the Trustee's motion [see Dkt. No. 341]; on March 9, 2017, when the Court entered an order granting the Trustee's motion to stay [Dkt. No. 342]; and on March 28, 2017, when the Court entered an amended order granting the Trustee's motion to stay [Dkt. No. 373];

5. On March 7, 2017, when the Trustee filed a motion for reconsideration of the order authorizing the release of the Lot 6 net sale proceeds to Ms. Kelly after accounting for all disputed claims and paying all joint claims of the Debtor and

Ms. Kelly because entireties property must be administered for the benefit of joint claims and he needed time to determine what joint claims existed [Dkt. No. 334]; on March 9, 2017, when Ms. Kelly filed an opposition to the Trustee's motion and argued there were sufficient funds to pay her after paying all secured claims and allowed joint claims [Dkt. No. 338]; on March 22, 2017 and April 25, 2017, when the Debtor and Ms. Kelly filed further responses to the motion [Dkt. Nos. 361 and 421]; on April 25, 2017, when the Court held a hearing on the Trustee's motion [see Dkt. No. 423]; and on April 28, 2017, when the Court entered an order granting the Trustee's motion for reconsideration and vacating the order authorizing the release of the Lot 6 net sale proceeds to Ms. Kelly [Dkt. No. 425];

6. On March 21, 2017, when the Debtor filed an Amended Schedule C and, for the first time, claimed Lot 6 exempt under *In re Monzon*, 214 B.R. 38 (Bankr. S.D. Fla.) (addressing exemption of entireties property under Section 522(b)(3)(B) and adopting the rationale in *Sumy v. Schlossberg*) [Dkt. No. 359];

7. On April 17, 2017, when the Trustee filed a motion to compel Debtor's counsel, McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A. ("McNamee") to turn over the Lot 6 net sale proceeds to him [Dkt. No. 400]; on May 15, 2017, when the Debtor filed his opposition to the motion [Dkt. No. 455]; on May 17, 2017 and August 15, 2017, when the Court held a hearing on the Trustee's motion and the Trustee said he needed to determine how much of the sale proceeds would have to be administered for the benefit of joint creditors [see Dkt. Nos. 468, 521 and 551]; and on August 31, 2017, when the Court entered an order granting the Trustee's motion to compel [Dkt. No. 566];

8. On June 26, 2017, when Ms. Kelly filed a motion seeking entry of an order directing the Trustee to distribute half of the Lot 6 net sale proceeds after accounting for all disputed claims and all joint unsecured claims of the Debtor and her [Dkt. No 517]; on July 10, 2017, when the Trustee filed an opposition arguing, among other things, that the funds must be used for tax claims and joint claims [Dkt. No. 532]; on August 15, 2017, when Ms. Kelly filed a reply to the Trustee's opposition, arguing that her share of the Lot 6 sale proceeds is not property of the Debtor's bankruptcy estate pursuant to *Sumy v. Schlossberg* and *In re Alvarez* [Dkt. No. 547]; on August 15, 2017, when the Debtor filed a joinder to Ms. Kelly's motion [Dkt. No. 549]; on August 15, 2017, when the Court held a hearing on Ms. Kelly's motion [see Dkt. No. 551]; and on August 18, 2017, when the Court issued a Court Instruction stating Ms. Kelly's appeal of a prior order divested the Court of jurisdiction over the request (and Ms. Kelly later withdrew the appeal) [Dkt. No. 554];

9. On August 3, 2017, when the Trustee filed an objection to the Debtor's tenants by the entireties exemptions [Dkt. No. 542]; on August 31, 2017, when McNamee filed a response to the Trustee's objection arguing its fees are a joint obligation that should be satisfied from the Lot 6 sale proceeds [Dkt. No. 572]; on September 14, 2017, when the Debtor filed a response to the Trustee's objection arguing that joint creditors should be paid from his entireties property but not

administrative claimants [Dkt. No. 592]; on December 19, 2017, when the Court held a hearing on the Trustee's objection to exemptions [see Dkt. Nos. 672 and 701]; and on December 22, 2017, when the Court entered an order overruling the Trustee's objection to exemptions [Dkt. No. 674];

10. On August 22, 2017, when Ms. Kelly filed a motion to vacate or stay this Court's order compelling McNamee to turn over the Lot 6 sale proceeds to the Trustee [Dkt. No. 559]; and on September 7, 2017, when the Court denied the motion [Dkt. No. 584];

11. On November 27, 2017, Ms. Kelly filed a motion seeking an order directing the Trustee to distribute some of the Lot 6 sale proceeds to her [Dkt. No. 640]; on December 8, 2017, when the Trustee filed an opposition to Ms. Kelly's motion arguing that joint claims must be paid before she can receive a distribution [Dkt. No. 657]; and on December 19, 2017, when the Court held a hearing on Ms. Kelly's motion [see Dkt. Nos. 672 and 701] (which Ms. Kelly withdrew on January 17, 2018 [see Dkt. No. 682]);

12. On December 12, 2017, when the Court held a hearing on the Trustee's motion to approve a settlement in *Myers v. Offit Kurman, P.A.*, Adv. No. 16-00474, and the Debtor and Ms. Kelly challenged whether the defendant had a joint unsecured claim but not whether joint claims had to be paid from entireties property [see Dkt. Nos. 38, 55 and 78 in that adversary proceeding];

13. On September 18, 2018, when the Debtor filed a motion to hold the Trustee in contempt for failing to turn over the Lot 6 sale proceeds [Dkt. No. 733]; on September 28, 2018, when the Court entered an order denying the Debtor's motion [Dkt. No. 736]; on October 12, 2018, when the Debtor filed a motion to reconsider the Court's order denying his motion to hold the Trustee in contempt [Dkt. No. 749]; and on October 19, 2018, when the Court entered an order denying the Debtor's motion to reconsider [Dkt. No. 758];

14. On October 17, 2018, when the Debtor and Ms. Kelly filed a motion for an accounting and for an order releasing the Lot 6 sale proceeds [Dkt. No. 753]; on October 31, 2018, when the Trustee filed a motion to strike the Debtor and Ms. Kelly's motion [Dkt. No. 772]; on November 14, 2018, when the Debtor filed an opposition to the Trustee's motion to strike [Dkt. No. 782]; and on November 27, 2018, when the Court entered an order dismissing the Debtor and Ms. Kelly's motion [Dkt. No. 784]; and

15. On October 29, 2018, when the Court held a status conference to gain an understanding of the extent of joint claims and any anticipated distribution to the Debtor and Ms. Kelly after payment of joint claims.[1]

---

[1] This is a barebones list of pleadings implicating the Entireties Issues and does not include most responses and oppositions to the referenced pleadings or many other related pleadings.

Notwithstanding the extensive litigation involving the Entireties Issues, the Debtor filed the Debtor's Motions, the Debtor served the Debtor's Discovery and Ms. Kelly filed the Kelly Litigation, all of which sought to relitigate the Entireties Issues.

The doctrines of collateral estoppel, judicial estoppel and equitable estoppel preclude further litigation of the Entireties Issues because the Entireties Issues have been considered by this Court multiple times, the Debtor and Ms. Kelly had more than ample opportunities to address the Entireties Issues and the Debtor and Ms. Kelly conceded the Entireties Issues in the earlier stages of this case.

Collateral estoppel, or issue preclusion, bars relitigation of an issue previously decided if the party against whom the prior decision is asserted had a full and fair opportunity to litigate that issue in the earlier case. *Combs v. Richardson*, 838 F.2d 112, 114 (4th Cir. 1988) (quoting *Allen v. McCurry*, 449 U.S. 90, 94-95 (1980)). Collateral estoppel treats as final those issues that were already actually and necessarily determined. *Id.* Where preclusion is based on a prior judgment of a federal court, the elements of federal collateral estoppel apply. *In re Gilson*, 250 B.R. 226, 232 (Bankr. E.D. Va. 2000). "Those elements are: (1) the issue sought to be precluded was the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a valid and final judgment; and (4) the determination was essential to the prior judgment." *Id*. (citing *Combs v. Richardson*, 838 F.2d 112 (4th Cir. 1988)). "[A]n order is final and appealable if it (i) finally determines or seriously affects a party's substantive rights, or (ii) will cause irreparable harm to the losing party or waste judicial resources if the appeal is deferred until the conclusion of the bankruptcy case." *Kore Holdings, Inc. v. Rosen (In re Rood)*, 426 B.R. 538, 546-47 (D. Md. 2010) (citing *In re Mason*, 709 F.2d 1313, 1316 (9th Cir. 1983) and R. Levin, *Bankruptcy Appeals*, 59 N.C. L. Rev. 967, 985-86 & n.140).

Any further litigation of the Entireties Issues is barred by the doctrine of collateral estoppel because the issues were involved in prior litigation in this Court, the issues were actually litigated, the issues were determined by multiple valid and final judgments and determination of the issues was essential to the prior judgments. For example, the Entireties Issues were litigated by the parties and decided by the Court in connection with the following:

- In the December 18, 2017 order approving the Trustee's settlement with Offit Kurman, P.A. ("Offit Kurman"), the Court stated, "The significance of this being a joint claim or obligation of both the Debtor and Mrs. Kelly is that the sale proceeds being held by the Trustee from the sale of Lot 6, a property asserted by the Debtors to have been owned as tenants by the entirety, would be available to satisfy Offit Kurman's allowed joint claim. *See Sumy v. Schlossberg*, 777 F.2d 921, 932 (4th Cir. 1985). The Trustee has a pending objection to the Debtor's claimed tenants by the entirety exemptions. That issue is set for hearing on December 19, 2017. At the December 12th Hearing, the Trustee agreed that Lot 6 was jointly owned by the Debtor and Mrs. Kelly, although he was unwilling to testify that they owned Lot 6 as tenants by the entirety. The exact nature of the joint ownership does not change the analysis herein. The sale proceeds would be available to satisfy joint claims provided Lot 6 was jointly owned." Ord. Granting Ch. 7 Tr.'s Mot. for Approval of Proposed Compromise and Settlement [Dkt. No. 59] at 4, n.2, *Myers v. Offit Kurman, P.A.*, Adv. No. 16-00474 (Bankr.

D. Md. Dec. 18, 2017). The order further states, "The proceeds from the sale of Lot 6 are being held in [the Trustee's] escrow account while the secured claims and joint unsecured claims are determined in this case, including Offit Kurman's claim. As noted above, the law in this Circuit is clear that tenants by the entirety property is available to satisfy secured and joint unsecured obligations. *See Sumy v. Schlossberg*, 777 F.2d 921, 932 (4th Cir. 1985). These claims get paid before Mrs. Kelly is entitled to receive her portion of the sale proceeds under section 363(j) because the Trustee cannot determine the amount of her portion until all secured and joint unsecured claims are established." *Id.* at 6.

- At the May 2, 2018 evidentiary hearing on the motion to vacate the previously-entered judgment avoiding Serv Trust's lien filed by the Debtor and Ms. Kelly, the Debtor argued that the Lot 6 sale proceeds are not property of his bankruptcy estate. In response, the Court stated, "They are to the extent there are joint debts, tax liabilities. … Here, to the extent that there are, you have to look at *Sumy versus Schlossberg*, to the extent that there are joint debts, then it is administered by the estate and if there's tax liabilities, it can be administered by the estate or it is not, it's subject to these other liens. I shouldn't say administered by the estate, it depends upon the circumstance. But they're joint obligations they are, and joint tax obligations. … It's not the same [as the factual situation in *Alvarez*], all right. So let's, I know we've gone over this before and I've argued it before and I've ruled on it before." Tr. of Hr'g [Dkt. No. 90] at 16:1-16:24, *Offit Kurman, P.A. v. Serv Trust*, Adv. Proc. 16-00541 (Bankr. D. Md. Jan. 25, 2019).

- At the conclusion of the continued evidentiary hearing on the motion to vacate on July 30, 2018, the Court concluded, "I have cited *In re: Sumy versus Schlossberg* which says that the trustee can administer property of the, the property where there's joint creditors." Tr. of Hr'g [Dkt. No. 91] at 87:23-87:25, *Offit Kurman, P.A. v. Serv Trust*, Adv. Proc. 16-00541 (Bankr. D. Md. Jan. 25, 2019).

The doctrine of judicial estoppel provides, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001). The purpose of this doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 749-50 (citations omitted). Courts look at several factors when deciding whether judicial estoppel applies to a particular case, including: (i) whether a party's later position is clearly inconsistent with its earlier position; (ii) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (iii) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 750-51. The United States Court of Appeals for the Fourth Circuit has invoked the doctrine of judicial estoppel to prohibit litigants from "playing fast and loose" or "blowing hot and cold" by barring parties from taking inconsistent positions during the course of litigation. *Federal Deposit Ins. Corp. v. Jones*, 846 F.2d 221, 234 (4th Cir. 1988) (quoting *United Virginia*

*Bank v. B.F. Saul Real Estate*, 641 F.2d 185, 190 (4th Cir. 1981)). Judicial estoppel has been applied by the Fourth Circuit when faced with a litigant's inconsistent positions in related cases or in the same or related litigation. *Id.*

The doctrine of judicial estoppel bars the Debtor and Ms. Kelly from further litigating the Entireties Issues. As demonstrated above, in the first three years of the bankruptcy proceeding, the Debtor and Ms. Kelly conceded that the Debtor's interest in the Lot 6 sale proceeds is property of his estate and must be administered for the benefit of joint claims. Moreover, during that time, they did not challenge that this Court has jurisdiction over the funds or that the Debtor's exemption did not apply until after joint claims are paid in full. (The Debtor did not even claim his entireties property exempt until 16 months into the case and one month after the Trustee was appointed.) Approximately three years into the case, the Debtor and Ms. Kelly reversed their positions and abandoned well-settled law on the Entireties Issues. However, by that time, the Court had already issued rulings on the Entireties Issues which set the administration of the estate on a defined course, resulting in the Trustee paying various allowed joint claims from the Lot 6 sale proceeds and taking other steps in reliance on the Court's prior orders. The Debtor and Ms. Kelly's positions in the first three years of the case are directly contrary to their current positions, and the Court accepted their earlier positions and granted relief with the support of (or lack of objection from) the Debtor and Ms. Kelly. It would be unjust for parties in interest in this proceeding to have to address the Debtor and Ms. Kelly's inconsistent positions, and it would be a waste of the parties' and the Court's resources to relitigate the Entireties Issues based on the Debtor and Ms. Kelly's reversal of positions. The doctrine of judicial estoppel mandates that the Court prohibit them from "playing fast and loose" or "blowing hot and cold" by barring them from taking inconsistent positions during the course of the bankruptcy proceeding. *Federal Deposit Ins. Corp. v. Jones*, 846 F.2d at 234. The record is replete with examples of the Debtor and Ms. Kelly's prior inconsistent positions. Examples include the following:

- On December 2, 2016, Serv Trust filed a Motion for Order Authorizing Release of Surplus Escrow Funds [Dkt. No. 222], which asserted that there would be $268,997.74 remaining from the Lot 6 sale proceeds after accounting for all non-Serv Trust disputed liens and unsecured claims against Debtor "and/or his nonfiling spouse" and requested release of that amount on account of its $951,384.45 secured claim against Debtor and Mrs. Kelly. Serv Trust withdrew the motion on February 1, 2017 [see Dkt. No. 289]. Notably, the Debtor is the co-trustee of Serv Trust.

- At the February 1, 2017 hearing on Ms. Kelly's motion seeking entry of an order authorizing the release of the Lot 6 net sale proceeds to her after accounting for all disputed claims and paying all joint claims of the Debtor and Ms. Kelly [Dkt. No. 269], Ms. Kelly's counsel stated; "Ms. Kelly understands, it's been explained to her that as the person who was an owner of property that was owned T by E with the Debtor, the proceeds from that sale are also T by E, and are only obligated to be used to pay the liens on the property and to pay the joint unsecured claims of Ms. Kelly and her husband." Tr. of Hr'g. [Dkt. No. 515] at 15:23-16:3 (Jun. 26, 2017). Ms. Kelly's counsel further stated, "Ms. Kelly agreed to allow

her funds to be used to pay for, number one, the joint claims because those are her obligations anyway." *Id.* at 50:8-50:10.

- At the February 15, 2017 continued hearing on Ms. Kelly's motion seeking release of the funds, her counsel stated, "the Chapter 7 trustee is not going to be entitled to use that money [the Lot 6 sale proceeds] for anything other than joint claims which we've addressed in our motion and have provided for in our motion." Tr. of Hr'g. [Dkt. No. 516] at 10:18-10:21 (Jun. 26, 2017). Ms. Kelly's counsel later discussed with the Court whether there will be any funds remaining for Ms. Kelly after payment of joint claims. *Id.* at 55:1-57:6. Her counsel summarized the issue before the Court by saying, "the issue that's before the Court is we have T by E money that everybody agrees is beyond the amounts that are necessary to pay joint unsecured claims and joint secured or the secured claims who have liens on the proceeds of lot 6. So the question is, the question before this Court is why shouldn't this money [after payment of secured and joint unsecured claims] be released to Ms. Kelly." *Id.* at 71:12-71:17. He stated further, "if all of the claims that are asserted as liens against the proceeds of the sale of lot 6 are allowed, and if all of the joint unsecured claims are allowed, there's enough money being left on the table as a result of this motion to pay them in full." *Id.* at 93:7-93:11. The Court thereafter granted Ms. Kelly's motion but subsequently vacated the order because the newly-appointed Trustee needed time to ascertain the joint claims to be paid from the Lot 6 sale proceeds.

- At the March 9, 2017 hearing on the Trustee's motion to stay the surplus order [Dkt. No. 330], Ms. Kelly's counsel argued that whether the Debtor claimed an exemption in the entireties property has no import because *Sumy v. Schlossberg* dictates that the funds be used to pay joint unsecured claims.

- On March 21, 2017, the Debtor filed an amended Schedule C [Dkt. No. 359], which claimed the following exemption for Lot 6: "100% of fair market value, up to any statutory limit" under "FLA. Common Law – Tenants by the Entirety (*In re Monzon*, 214 B.R.38, 40 (Bankr. S.D. Fla. 1997)) Proceeds Held in Escrow by Debtor's Counselor." This was the first time the Debtor claimed an exemption in the proceeds, and he cited to a case that adopted the rationale and holding in *Sumy v. Schlossberg*.

- On June 26, 2017, Ms. Kelly filed an Emergency Motion for Order Directing Immediate Distribution of Her Full Share of Lot 6 Proceeds [Dkt. No. 517] in which she argued that, after payment of all joint claims, including the disputed claims of Offit Kurman and McNamee, there would be $148,737.54 in proceeds from the sale of Lot 6 available for distribution to her and the Debtor. She maintained that she was entitled to 50% of that amount, or $74,368.77. The Debtor filed a Joinder to the Emergency Motion on August 15, 2017 [Dkt. 549]. The Court issued a "court instruction" regarding this motion stating that a pending appeal divested the Court of jurisdiction to consider the motion [see Dkt. No. 554].

➢ On September 14, 2017, the Debtor filed a response to the Trustee's objection to his tenants by the entireties exemption, arguing that joint creditors should be paid from his entireties property but not administrative claimants [Dkt. No. 592].

➢ On November 27, 2017, Ms. Kelly filed an Emergency Motion for Order Directing Distribution of the Proceeds From the Sale of Lot 6 [Dkt. No. 640]. Through this Motion, Ms. Kelly requested that 50% of the Lot 6 proceeds, in the amount of $673,905.21, be immediately released to her based on her assertion that her share of the proceeds could not be administered in the Debtor's bankruptcy case. Ms. Kelly withdrew this Motion on January 17, 2018 [see Dkt. No. 682], prior to the Court considering the request.

➢ On September 18, 2018, the Debtor filed a Motion to Hold Trustee in Contempt and or Award of Monetary Sanction [Dkt. No. 733]. In that motion, the Debtor argued that the Lot 6 net sale proceeds in the amount of $1,110,247.01 were not and never have been property of his bankruptcy estate and that only his "individual undivided interest" was included in his bankruptcy estate but was subsequently exempted. The Motion relied on *In re Alvarez* and other Fourth Circuit cases to argue, for the first time, that joint creditors must have a judgment against both spouses to access entireties property. The Motion states: "Fourth Circuit precedent inclusive of the Fourth Circuit's holding in *Alvarez*, coupled with the Exemptions Order, is dispositive here." Mot. at 11.

Equitable estoppel allows "'a person's act, conduct or silence when it is his duty to speak,' to preclude him from asserting a right he otherwise would have had against another who relied on that voluntary action." *First Union Commercial Corp. v. Nelson, Mullins, Riley and Scarborough (In re Varat Enterprises, Inc.),* 81 F.3d 1310, 1317 (4th Cir. 1996) (quoting Black's Law Dictionary). The purpose of this doctrine is to "protect any adversary who may be prejudiced by the attempted change of position." *Id. (*quoting *Guinness PLC v. Ward,* 955 F.2d 875, 899 (4th Cir.1992)). Equitable estoppel "is the consequence worked by operation of law which enjoins one whose action or inaction has induced reliance by another from benefitting from a change in his position at the expense of the other." *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc*., 202 F.3d 223, 228 (4th Cir. 2000) *(*citing *Employers Commercial Union Ins. Co. of America v. Great American Ins. Co.,* 200 S.E.2d 560, 562 (Va. 1973)). The doctrine of equitable estoppel requires that a party prove that his failure to act in a timely fashion was the result of another party's deliberate design and that the party actually and reasonably relied on the other party's conduct. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128-29 (4th Cir. 1987).

The doctrine of equitable estoppel applies here. At various hearings in 2017 and 2018, there were extensive discussions among the Court and the parties – including the Debtor and Ms. Kelly – regarding the requirement that the Trustee administer the Lot 6 sale proceeds for joint creditors before any distribution can be made to the Debtor or Ms. Kelly. During many of these discussions, the Debtor and Ms. Kelly did not express any opposition. They cannot now, several years later, lodge objections that could have and should have been raised when the Entireties Issues were squarely before the Court. In addition to other examples cited in this Memorandum, the Court highlights the following opportunities for the Debtor and Ms. Kelly to have raised their objections and arguments:

- At the April 25, 2017 hearing on the Trustee's motions to stay and reconsider the Court's order directing the release of funds to Ms. Kelly, counsel for the Trustee stated that the Trustee believed the Lot 6 sale proceeds will not be sufficient to pay all joint unsecured claims in full. The Court stated that she would reconsider the order and would not have entered the order if it had known there may not be enough funds to pay joint unsecured claims.

- At the August 15, 2017 hearing on the Trustee's motion to compel the Debtor's counsel to turn over the Lot 6 sale proceeds to him and numerous pending motions by the Debtor and Ms. Kelly, the parties discussed extensively whether there would be sufficient funds to pay all joint claims so that the Trustee could make a distribution to Ms. Kelly.

The barrage of litigation commenced by the Debtor and/or Ms. Kelly, the frequent filing then withdrawal of motions and appeals by them and the dilatory tactics exhibited by them make clear that the Debtor, and possibly Ms. Kelly, are engaged in a bad faith scheme to delay the administration of the Debtor's bankruptcy estate. The United States District Court for the District of Maryland has addressed the Debtor and Ms. Kelly's misconduct on numerous occasions. For example:

- "Appellants [the Debtor and Ms. Kelly] have persisted in questionable litigation strategy that can only be viewed as dilatory and irresponsible." *Myers v. Schlossberg*, No. 8:18-cv-03783-PX, 2019 WL 414875 at *1 (D. Md. Feb. 1, 2019).

- In discussing the Debtor's failure to prosecute his appeals, "This behavior has become a longstanding pattern for Myers. In his twenty cases, Myers initiates the action, then exhibits a dereliction in prosecution that reflects no real interest in resolution on the merits. The Court cannot help but conclude that Myers' true goal is to gum up the judicial process for his own personal benefit and ignore valid court orders as he sees fit. … At this juncture, Myers is on notice that further similar conduct may result in the initiation of contempt proceedings against him." *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.*, No. 8:19-cv-00636-PX, 2020 WL 758154 at *4 (D. Md. Feb. 13, 2020).

- "[The Debtor] has undoubtedly used (and abused) the judicial process to prolong proceedings in the bankruptcy matter and thus delay liquidation and distribution of Myers' assets. Specifically, Myers has filed no fewer than *fifteen appeals* and several other collateral actions related to [a] 2015 singular bankruptcy, the lion's share of which have been dismissed or denied on procedural grounds. Indeed, when viewed collectively, Myers' overall objective appears largely to defer rather than reach meaningful resolution on the merits." *Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.*, No. 8:18-cv-03460-PX, 2020 WL 758151 at *3 (D. Md. Feb. 14, 2020) (emphasis in original). "This case presents its own microcosm of Myers' dilatory tactics." *Id.* at *4. "In this Court's view, Myers once again attempts, seemingly in bad faith, to manufacture further delay in the

> resolution of his claims. The Court cannot countenance Myers' now routine abuses of process to defer ultimate resolution on the merits." *Id.* at *5.

The Debtor has shown a pattern of abusive litigation tactics, and whether willfully or innocently, Ms. Kelly has been a participant in the same pattern and scheme.

The bankruptcy process is designed to help the honest but unfortunate debtor. Its purpose is to provide a fresh start to a debtor while maximizing the return to creditors and balancing the interests of all parties in interest. The Debtor voluntarily sought relief under the Bankruptcy Code, and this Court will give him every reasonable opportunity to get a fresh start. However, this Court will not allow him or anyone else to pervert the process or flout the law. The Trustee has an obligation to expeditiously administer this estate, and his efforts have been repeatedly hampered by the Debtor and Ms. Kelly's vexatious filings.

Any further motions by the Debtor, Ms. Kelly or anyone else seeking to relitigate the Entireties Issues, absent a change in the current circumstances, will be taken by this Court as an act of bad faith and will be met with appropriate sanctions. The Court has the inherent authority to regulate the behavior of those appearing before it and will not tolerate the continued pursuit of matters previously litigated and/or denied. The Court is giving Debtor and Kelly an opportunity to put this conduct behind them, and the Court sincerely hopes they take it.

cc: Debtor – Gregory B. Myers
Chapter 7 Trustee – Roger Schlossberg
Counsel for Chapter 7 Trustee – Frank J. Mastro
U.S. Trustee
Party in interest – Barbara Ann Kelly
All other parties in interest

**END OF MEMORANDUM**